UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| RICHARD ADORNO,<br><br>                Petitioner,<br>v.<br><br>ISIDRO BACA, et al.,<br><br>                Respondents. | Case No. 3:15-cv-00160-LRH-WGC<br><br>ORDER |

This habeas matter under 28 U.S.C. § 2254 comes before the court on respondents' motion to dismiss petitioner Richard Adorno's counseled first-amended petition as untimely (ECF No. 15). Adorno opposed (ECF No. 19), and respondents replied (ECF No. 39). As discussed below, this petition must be dismissed as untimely.

I. **Background**

On October 5, 1983, Adorno pleaded guilty to one count of first-degree kidnapping and one count of sexual assault (first-amended petition, exhibit 12).[1] Prior to entering into the guilty plea agreement, on August 17, 1983, the state district court granted Adorno's county public defender's motion for a psychiatric evaluation. Exhs. 9, 10. Based on two psychiatric evaluations that concluded that Adorno was competent, the state district court found that he was able to distinguish between right and wrong and to understand the nature and quality of his acts at the time of the alleged crimes and also that he was currently able to rationally assist in his own defense. Exhs. 11; 12, pp. 3-4;

---

[1] Exhibits referenced in this order are exhibits to petitioner's first-amended petition (ECF No. 10) and opposition to the motion to dismiss (ECF No. 19) and are found at ECF Nos. 11, 20-36.

1

14. The state district court sentenced him to two, concurrent terms of life with the possibility of parole after five years, and judgment of conviction was also entered on October 5, 1983. Exh. 15.

Adorno did not file a direct appeal. Thirty years later, on November 12, 2013, he filed a motion to correct illegal sentence, which the state district court construed as a state postconviction petition for writ of habeas corpus based on the nature of the claims asserted. Exhs. 17, 18, 19. The state district court denied the petition as time-barred and rejected Adorno's argument that good cause existed for his delay. Exh. 24. On October 15, 2014, the Nevada Supreme Court affirmed the denial of the petition, and remittitur issued on November 13, 2014. Exhs. 28, 29.

Adorno dispatched his federal habeas petition for mailing on March 9, 2015 (ECF No. 5). This court appointed counsel, and counsel filed a first-amended petition on September 29, 2015 (ECF No. 10). Respondents have moved to dismiss the petition as time-barred (ECF No. 15).

## II.   **Legal Standards**

The Antiterrorism and Effective Death Penalty Act (AEDPA) went into effect on April 24, 1996, and imposes a one-year statute of limitations on the filing of federal habeas corpus petitions. 28 U.S.C. § 2244(d). The one-year time limitation can run from the date on which a petitioner's judgment became final by conclusion of direct review, or the expiration of the time for seeking direct review. 28 U.S.C. § 2244(d)(1)(A). Further, a properly filed petition for state postconviction relief can toll the period of limitations. 28 U.S.C. § 2244(d)(2).

Where a state petitioner's conviction became final prior to AEDPA's enactment, the one year time period to file a federal petition did not begin to run until AEDPA's enactment date. *Calderon v. United States Dist. Ct. (Beeler)*, 128 F.3d 1283, 1287 (9th Cir. 1997), overruled in part on other grounds by *Calderon v. United States Dist. Ct. (Kelly)*, 163 F.3d 530, 540 (9th Cir. 1998) (en banc). Accordingly, state petitioners falling into that category had a one-year grace period after AEDPA's enactment date to

file their federal habeas petitions. *Id.* The grace period expired on April 24, 1997. *Patterson v. Stewart*, 251 F.3d 1243, 1246 (9th Cir. 2001).

A petitioner may be entitled to equitable tolling if he can show "'(1) that he has been pursuing his right diligently, and that (2) some extraordinary circumstance stood in his way' and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2009)(quoting prior authority). Equitable tolling is "unavailable in most cases," *Miles v. Prunty*, 187 F.3d 1104, 1107 (9th Cir. 1999) and "the threshold necessary to trigger equitable tolling is very high, lest the exceptions swallow the rule," *Miranda v. Castro*, 292 F.3d 1063, 1066 (9th Cir. 2002) (quoting *United States v. Marcello*, 212 F.3d 1005, 1010 (7th Cir. 2000)). The petitioner ultimately has the burden of proof on this "extraordinary exclusion." 292 F.3d at 1065. He accordingly must demonstrate a causal relationship between the extraordinary circumstance and the lateness of his filing. *E.g., Spitsyn v. Moore*, 345 F.3d 796, 799 (9th Cir. 2003).

Ignorance of the one-year statute of limitations does not constitute an extraordinary circumstance that prevents a prisoner from making a timely filing. *See Rasberry v. Garcia*, 448 F.3d 1150, 1154 (9th Cir. 2006) ("a *pro se* petitioner's lack of legal sophistication is not, by itself, an extraordinary circumstance warranting equitable tolling").

With respect to equitable tolling due to mental impairment, the Ninth Circuit has set forth a two-part test:

> (1) First, a petitioner must show his mental impairment was an "extraordinary circumstance" beyond his control . . . by demonstrating the impairment was so severe that either
>
> (a) petitioner was unable rationally or factually to personally understand the need to timely file, or
>
> (b) petitioner's mental state rendered him unable to personally prepare a habeas petition and effectuate its filing.
>
> (2) Second, the petitioner must show diligence in pursuing the claims to the extent that he could understand them, but that the mental impairment made it impossible to meet the filing deadline under the totality

3

>of the circumstances, including reasonably available access to assistance . . . .

*Bills v. Clark*, 628 F.3d at 1099-1100 (9th Cir. 2010) (emphasis in original)(footnotes omitted); *see also id.* at 1100-01.

In *Forbess v. Franke*, the Ninth Circuit concluded that the petitioner had demonstrated that his severe and unique mental illness made it impossible for him to timely file his federal petition. 749 F.3d 837, 841-842 (9th Cir. 2014). The court agreed with the district court that Forbess satisfied the first *Bills* prong because he showed that his mental illness was "so severe that [he was] unable . . . to understand the need to timely file." *Bills*, 628 F.3d at 1093. The Ninth Circuit observed that the record demonstrated Forbess' extensive history of severe mental illness and recounted the following findings of fact:

>Petitioner believed he was working undercover for the FBI, and his trial was a "sham" orchestrated to lure his ex-wife out of hiding and arrest her for being part of an extensive drug distribution operation. Petitioner's claim that his delusions persisted from the time of his trial to the expiration of the limitations period is supported by the psychological evaluations of Dr. Fickle, Dr. McDonald, and Dr. Melnick, and by the mental health records. During the relevant time period, Petitioner genuinely believed the FBI would release him once they arrested his ex-wife. As such, he was incapable of rationally understanding the necessity of filing a timely habeas petition.

*Forbess*, 749 F.3d at 840. *Compare Orthel v. Yates*, 795 F.3d 935, 939 (9th Cir. 2015) ("Although Orthel grappled periodically with significant mental health issues during his incarceration, the voluminous medical and prison records show it was not unreasonable for the district court to determine that Orthel was capable of understanding the need to timely file and effectuating a filing . . . . the entire eleven-year period (between the date on which the statute of limitations began to run and the date on which Orthel filed his petition) contained significant spans of time in which Orthel participated productively in [correspondence courses and prison programming]").

III. **Instant Petition**

Adorno sets forth two grounds for relief in the amended petition. In ground 1 he contends that his plea counsel rendered ineffective assistance in violation of his Sixth and Fourteenth Amendment rights because he (A) failed to adequately investigate a possible insanity defense; (B) failed to adequately litigate the competency issue; (C) failed to ensure that Adorno's guilty plea was voluntary; and (D) failed to consult with Adorno about an appeal or to file a notice of appeal (ECF No. 10, pp. 4-16). In ground 2 he claims that the State treated him with anti-psychotic medication against his will in violation of his Fifth and Fourteenth Amendment rights to due process. *Id.* at 16-19.

The parties do not dispute that the AEDPA one-year statute of limitations expired about sixteen years before Adorno filed his state postconviction petition, which was the first action he took in his case after the entry of the judgment of conviction. Adorno did not submit his federal petition for filing until March 9, 2015 (ECF No. 5). This federal petition is, therefore, time-barred, unless Adorno is entitled to equitable tolling of the statute of limitations.

Adorno argues that he is entitled to equitable tolling of all of the time from April 24, 1997, until he mailed his federal petition on March 9, 2015 (ECF No. 19, p. 15). He filed voluminous prison mental health and administrative records with his opposition to the motion to dismiss. Exhs. 30-43. He contends that the prison records demonstrate that he was seriously mentally ill before his incarceration in Nevada and that he continued to suffer serious mental illness that prevented him from understanding the need to timely file a federal habeas petition and/or effectuating such filing (ECF No. 19).

The August 1983 Lakes Crossing psychiatric evaluations completed prior to Adorno pleading guilty indicated that when he was admitted to Lakes Crossing he was actively hallucinating and very paranoid. Exh. 11. The medical director's evaluation stated that after intensive medication Adorno seemed far less delusional. The medical director concluded that Adorno had become or was rapidly becoming competent to stand trial but only as a result of heavy medication. *Id.* The medical director then reported in

September 1983 that Adorno was competent to stand trial, was well aware of the charges against him and would have no trouble assisting in developing a strategy for his defense.[2] *Id.*

Next, the NDOC records reflect that Adorno has suffered mental and physical health issues while in Nevada state custody. However, the NDOC records simply do not support a conclusion that Adorno was seriously mentally and/or physically impaired for almost the entirety of the more than thirty years that he has been in NDOC custody. The medical documentation tends to indicate that Adorno's mental illness was greatly exacerbated by abuse of illegal drugs and that his condition improved when he was not using such drugs, together, initially, with some amount of psychotropic medication and with other mental health care. *See, e.g.*, exh. 30, pp. 34-41; exh. 32, p. 25; *see generally* NDOC medical records.

NDOC classification committee notes even as far back as 1988 reflect the following: Adorno was a "bonafide psychiatric inmate," but his mental health had been stabilized for the past five years; he was sane, lucid, candid, and he accepted responsibility for his crimes. Exh. 33, pp. 88-90. As of 1989, Adorno had been off psychotropic medications for five years. *Id.* at 99; exh. 32, p. 25 (*see also* exh. 33, p. 103, indicating, with no elaboration, only that Adorno had "psychological problems"). Notes from an incident in 2000 indicate that Adorno was upset because "he was unable to manipulate his way into a psych single cell." *Id.* at 102. Adorno was evaluated, it was noted that he had only mild mental illness, and no basis to transfer him to the mental health unit for observation or medication was found. *Id.*

Petitioner points to a December 1995 parole board agenda that says that if he was ever released it should be to a very secure mental health facility. Exh. 32, p. 48, 52. However, that same document indicates that Adorno was not on psychotropic medications at that time and was functioning within reasonable limits for an incarcerated

---

[2] The court recounts the state-court determination that Adorno was competent to stand trial because it demonstrates that he was heavily medicated for psychosis for some time period in 1983.

setting. His psychological status at that time was listed as: chronic mental illness currently in remission with therapy. *Id.* at 47.

In a 1998 psychological evaluation for the parole board, the evaluator stated "no serious mental illness is indicated." Exh. 32, p. 68. That evaluation also noted that Adorno was initially classified as having serious mental illness based solely on his self-report and that at that time (1998) he was seeing a psychologist about six times per year. *Id.* Progress notes from 1998 indicated that Adorno had been off psychotropic medications for ten years, and he self-reported that it had been seven to eight years since he had heard voices. Exh. 40, p. 177.

Adorno also points to prison records documenting that in another incident in 2000, he complained about stress and urged that due to his mental health he was unable to be in general population. Exh. 36, pp. 2-3. However, when prison mental health personnel were consulted, they stated that Adorno was a manipulator and that he had other health problems but had been off psych medications for years. Prison administrators ultimately warned Adorno that future manipulations for psych beds would result in his transfer. *Id.*

Prison records from March and April 2001 contain notations such as "likes to paint and is very good at it . . .bright, but has a stubborn streak in him . . . uses mild mental illness to manipulate single cell . . . not seen as mental health so much as behavioral problem . . . will claim serious mental health issues to get his own way." *Id.* at 4-5. The records contradict Adorno's contention that his severe mental impairment mandated "segregated confinement," but rather reflect that Adorno preferred to be housed in a single cell, where there was less noise and where he could pursue his painting. *See, e.g., id.* at 3.

Adorno had a heart attack in October 2001. Exh. 42, pp. 68-70; exh. 38, p. 25, 107. A stent was inserted, and Adorno ultimately underwent triple bypass surgery in March 2002. Exh. 38, pp. 41, 105-108, 186-188. He was apparently housed in the Regional

Medical Facility infirmary until March 2007. Exh. 36, p. 2. According to Adorno, he had weekly check-ups until about December 2005. Exh. 42, pp. 1-69.

Finally, parole board notes in October 2010, indicated that he was stable, not prescribed antipsychotic medications and that there were no special recommended mental health conditions for his parole (such as inpatient or outpatient mental health treatment or medication). Exh. 32, pp. 2-3, 14.

Adorno also includes his May 2016 affidavit, in which he states the following: he has a long history of psychiatric disorders and was diagnosed as a chronic paranoid schizophrenic in 1980. Exh. 37. When he began his sentence in 1983 for the crimes in this case, he told NDOC psychiatrists that he was feeling paranoid and hearing voices. While he was treated early in his incarceration, he complained that his mental health treatment was insufficient. He has been housed the majority of the time in psych cells; he generally stays in his cell painting. In February and March 2001, he was in "maximum lockdown" due to his mental health issues. He had a heart attack in 2001 and was ultimately housed in the infirmary until 2007. Between 2007 and 2012, he was not receiving psychiatric treatment but heard voices and believed that the FBI and CIA were listening to his conversations. His mental health improved enough in 2013 that he was able to file his state postconviction petition in November 2013. Prior to that he was "not aware of what was happening due to [his] mental illness." *Id.*

The court has carefully reviewed all the briefing, the state-court record, and the NDOC records in this case. The record reflects that petitioner suffers from mental health issues and has received treatment while incarcerated with the NDOC. The court notes that he has not been on extensive regimens of psych medications while in NDOC custody. Moreover, the records provided do not demonstrate that Adorno's mental impairment was so severe that he was unable to rationally or factually understand the need to timely file, or unable to personally prepare and file a habeas petition and that it caused it to be impossible for him to meet the filing deadline. Instead, Adorno's records tend to reflect that he suffered from mild mental illness and used vague threats that his

deteriorating mental health would cause him to become violent in order to try to manipulate staff, in particular in order to try to secure a single cell. Frankly, the record does not support the bare assertions in Adorno's affidavit of severe mental impairment that prevented him from filing a federal habeas petition. The record indicates that Adorno's situation resembles that of the petitioner in the *Orthel* case discussed above – in fact, Adorno has not necessarily shown that he suffered severe mental impairment for any significant period of time during his nearly thirty years in NDOC custody. In *Forbess*, the court concluded that the petitioner labored under severe and persistent delusions that he was working undercover for the FBI. However, here, Adorno does not cite to any part of the extensive NDOC medical records he included; instead he offers only his own affidavit to support his claim that he suffered delusions that the FBI and the CIA were listening to his conversations. Adorno makes the bare assertion in his affidavit that his mental health improved enough in 2013 that he was able to file a state postconviction petition, with no elaboration whatsoever, and with no citation to any support.

The court concludes that petitioner has not met his burden to demonstrate that extraordinary circumstances beyond his control–that either he was unable rationally or factually to personally understand the need to timely file, or his mental state rendered him unable to personally prepare a habeas petition and effectuate its filing–and that he diligently pursued the claims to the extent that he could understand them, but that the mental impairment made it impossible to meet the filing deadline under the totality of the circumstances. Accordingly, petitioner has not met his burden under the two-part test laid out in *Bills*. Adorno's petition shall be dismissed as time-barred.

## IV. **Certificate of Appealability**

In order to proceed with an appeal, petitioner must receive a certificate of appealability. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22; 9th Cir. R. 22-1; *Allen v. Ornoski*, 435 F.3d 946, 950-51 (9th Cir. 2006); *see also United States v. Mikels*, 236 F.3d 550, 551-52 (9th Cir. 2001). Generally, a petitioner must make "a substantial

showing of the denial of a constitutional right" to warrant a certificate of appealability. *Id.*; 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). "The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* (quoting *Slack*, 529 U.S. at 484). In order to meet this threshold inquiry, the petitioner has the burden of demonstrating that the issues are debatable among jurists of reason; that a court could resolve the issues differently; or that the questions are adequate to deserve encouragement to proceed further. *Id.* Pursuant to Rule 11(a) of the Rules Governing Section 2254 and 2255 Cases, district courts are required to rule on the certificate of appealability in the order disposing of a proceeding adversely to the petitioner or movant, rather than waiting for a notice of appeal and request for certificate of appealability to be filed. This court has considered the issues raised by petitioner, with respect to whether they satisfy the standard for issuance of a certificate of appealability, and determines that none meet that standard. The court therefore denies a certificate of appealability.

     **IT IS THEREFORE ORDERED** that respondents' motion to dismiss the first-amended petition (ECF No. 15) is **GRANTED**. The petition is **DISMISSED** as untimely.

     **IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

     **IT IS FURTHER ORDERED** that respondents' first and second motions for extension of time to file a response to the first-amended petition (ECF Nos. 12 and 13) are both **GRANTED** *nunc pro tunc*.

     **IT IS FURTHER ORDERED** that petitioner's first and second motions for extension of time to file his opposition to the motion to dismiss (ECF Nos. 16 and 17) are both **GRANTED** *nunc pro tunc*.

     **IT IS FURTHER ORDERED** that petitioner's motion for leave to file exhibits under seal (ECF No. 37) is **GRANTED**.

     **IT IS FURTHER ORDERED** that respondents' motion for extension of time to file a reply in support of their motion to dismiss (ECF No. 38) is **GRANTED** *nunc pro tunc*.

1  **IT IS FURTHER ORDERED** that the Clerk shall enter judgment accordingly and
2  close this case.
3  DATED this 15th day of September, 2016.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE

11